ROBERT B. HELMS, tenant in possession, plaintiff in error, vs. BENJAMIN MAY, lessor, &c., defendant in error.

[1.] Adverse possession of land is notice of the holder's title to all persons who purchase during its continuance.

[2.] A sale of lands made in the face of an adverse possession is void.

Ejectment, in Stewart Superior Court. Tried before Judge KIDDOO, April Term, 1857.

This was an action in the ejectment form, by 'Benjamin May, lessor of John Doe, against Robert B. Helms, tenant in possession, and claiming to be the true and lawful owner for lot of land No. 239, in the 22d district of the first section of Stewart county.

This case was before this Court at June Term, 1858, and will be found reported in 26 *Ga. Rep's, p.* 132; the judgment of the Court below being then reversed by this Court, the case came up again for trial at April Term, 1859, of Stewart Superior Court, when plaintiff offered in evidence:

1st. A grant from the State to Green H. O'Bannon for the lot in controversy, dated 23d December, 1837.

2d. A deed from O'Bannon, by his attorney James R. Butts, to plaintiff, May, dated 20th November, 1855, and recorded 26th November, 1855.

3d. *Abram* ———, testified that he knew the O'Bannon lot, that Helms was in possession of it in January, 1855, and was now in possession; that there were twenty-five or thirty acres cleared; that defendant was in possession at the time May purchased it from O'Bannon; that sometime between 20th and 25th of November, 1855, he met plaintiff, May, at the depot in Macon; it was at night; May enquired of him if he knew lot two hundred and thirty-nine, in the 22d district of Stewart county; a vacant lot. Witness replied, that he did not know the lot by number, and that there was but one vacant lot in the settlement, and that was the Taylor lot

which lay North of Mrs. Glenn's. May asked him if Helms did not live in that neighborhood, and witness answered that Helms lived on the lot north of the lot on which Spann's bridge was. May then asked if he knew the O'Bannon lot, and witness thinks he said to him, that was the lot, and wished to know how much it was worth. Witness told him that was the lot on which Helms was living, and was worth from four to five dollars per acre. From the conversation, witness was impressed with the belief that the Helms' lot was the lot May was enquiring about, and believed that there would be a lawsuit about it.

4th. *James Fitzgerald*, testified : That he knew the lot in question. Helms was in possession in 1856, and at the commencement of this suit. Not certain whether defendant was in possession earlier than 1856; there was about twenty-five acres cleared on the lot.

Here plaintiff closed.

Defendant then submitted the following evidence :

1st. A deed from O'Bannon the grantee to Deveraux Jarratt, for the lot of land in controversy, dated 5th November, 1833.

2d. A deed from the executors and legatees of Deveraux Jarrett, deceased, to defendant, for the lot in controversy, dated 17th October, 1854. Recorded 3d December, 1855.

3d. Defendant then read in evidence a deed from himself to William E. Paramour, to the west half of said lot.

4th. *William R. Mathis*, testified : That he knew lot No. 239, in the 22d district of originally Lee now Stewart county. Defendant went into possession of said lot in 1855, and had remained on it ever since; that he was in possession in November, 1855, at the time Benjamin May purchased it.

The testimony being closed, defendant requested the Court to charge the jury, as follows, to-wit :

1st. That if they believed from the evidence that the de-

fendant was in possession of the lot of land in controversy, at the time May became the purchaser, that then the deed from O'Bannon to May was void.

2d. That if they believe from the evidence that Helms was in possession on the day that May purchased, then that possession was notice to May, and the deed to him from O'Bannon, although recorded in time, did not take precedence of the deeds from O'Bannon to Jarratt, and from the executors and legatees of Jarratt to defendant, notwithstanding they were not recorded in time. Which requests the Court refused to give in charge, but charged the jury, that if they believed from the evidence that defendant was in possession at the time May purchased from O'Bannon, that though that might be some notice to May, yet in order to give the deed under which defendant held said lot, priority over May's deed, May must at the time he took said deed, have had knowledge of Helm's possession.

To which charge and refusal to charge, counsel for defendant excepted.

The jury found for the plaintiff the east half of the lot, which were the only premises in dispute or controversy in this suit.

Whereupon defendant moved for a new trial, on the grounds of error in the charge, and refusal to charge, as above stated, and because the verdict was contrary to law, the evidence, and the charge of the Court.

The Court below overruled the motion and refused to grant a new trial and defendant excepts.


B. S. WORRILL, represented by B. HILL, for plaintiff in error.


E. H. BEALL, contra.

*By the Court.*—STEPHENS J. delivering the opinion.

[1.] We all concur that the Court ought to have charged as requested, that adverse possession of Helms when May's deed was made, was notice to May of Helms' title.

[2.] A majority of the Court, (I being one of that majority,) also think that the Court ought to have given the other charge as requested; that the adverse possesion made May's deed void. I place my opinion not at all upon the much controverted statute of 32 *Henry VIII,* but solely on the common law. It seems to be conceded by both Judge Mc-DONALD and Judge BENNING, in their elaborate and very able opinions on the opposite side of this subject, and it certainly cannot be successfully disputed, that by the common law no valid title can be conveyed to a thing, when there is an obstacle in the way of the purchaser's taking possession *according to the tenor of the deed.* A man cannot sell a lawsuit, nor the right of suing. Judge BLACKSTONE, in his 4 *Bk. Com.* 135, says, this is "one main reason why a *chose* in action, or thing of which one hath the right but not the possession, is not assignable at common law; *because no man should purchase any pretence to sue in another's right."* Judges have often announced this principle from the Bench, and I repeat, that it seems not to be denied to be a principle of common law. But it is said first, that this principle of the common law was never in force in Georgia; and, second, that if ever in force, it has been repealed. I think the argument in answer to both these positions is very satisfactory. Without discussing the question, whether Georgia was settled as an uninhabited or as a conquered country, it certainly is a case where the settlers brought their own laws with them from England. In such a case, the rule, as stated by Judge BLACKSTONE, and as accepted without dispute in this discussion, is that the settlers bring with them, "*all* the English laws then in being." Such is the *rule.* The *exception* is, such of those laws as are inapplicable or inconvenient to

the new country.   The principle that a sale is rendered void
by an adverse possession at the time of making it, is within
the rule; can it be shown to be also within the exception ?
Was that principle inapplicable or inconvenient to the settle-
ment of Georgia?   On the contrary, I think it had an appli-
cability and a necessity here, far beyond what it had in Eng-
land.   I think the argument of Judge BENNING to show that
the 32 *Henry VIII*, in its full extent, was inapplicable and in-
convenient, is unanswerable.   But this common law principle
is a quite different thing from that statute, in all those fea-
tures of the statute upon which he animadverts so powerful-
ly and so successfully.   That statute, with its provision that
no sale of land should be good unless the vendor or those
under whom he claimed, had been in possession a whole
year next before the sale, would indeed have been a fatal ob-
struction to the rapid population and settlement of the wild
lands of Georgia.

But no such objection can be successfully made against
the common law principle under consideration.   It would
have been a bad thing indeed to have required purchasers to
wait a whole year before they could buy, but it was an ex-
cellent good thing to require them to pass by all lands which
they found already pre-occupied by an adverse holder, and
push on to the great expanse of *unoccupied*, and therefore un-
productive lands.   Their obvious policy was not to encour-
age wrangling about settlements already made, but to stimu-
late the making of *new* ones; not to waste their time in the
delays of the law, but to avoid controversy, that they might
thrive by industry in an uncontested field.   What they need-
ed was not lawsuits, not *chances* for lands at the end of a
long litigation, but *land*—land into which they could enter
*immediately*, go to *work*, make provisions and raise families.
The foundation and reason of this common law principle,
was its morality.   In addition to this reason, which lost none
of its force by being transplanted from the old continent to
the new, it was a matter of great importance to the new set-

Helms vs. May.

tlers as a mere economy of *time.* Strange indeed and unwise would it have been, had these men cast aside a principle which, by preserving their time, and their means from being wasted in tedious and unprofitable lawsuits, must have contributed so much to the rapid occupation and early development of their new country. So strange and so unwise, that I do not believe it happened. Any reasoning which deprives those men of this part of the common law, takes away from them the whole body of it. I think, therefore, it is quite clear, that this principle was not excepted from that general body of the English laws which our ancestors imported into Georgia. But it is said it was repealed by the Registry Act of 1755. That Act provides that all deeds duly recorded shall prevail over prior but unrecorded deeds; and it is claimed that the force and effect of this provision is, that such recorded deeds shall be good, although made in the face of an adverse possession. This argument is bad, because it proves too much. As well may you say these deeds shall be good, although made in the face of a *fraud;* or in the face of the fact that the grantor was an idiot, and so incaple of contracting; or in face of the fact, that the grantor had no title, and so could not possibly convey one; or in face of any of the many causes which have in all times been held as fatal to the validity of deeds. The argument is, that *all* recorded deeds are to be good, *without excepting those made in the face of an adverse possession.* So are they all to be good, I reply, without excepting those which are procured by fraud, or those which are procured on an illegal consideration, or from an idiot or from a married woman; without excepting any of those causes which all mankind hold as blackening and avoiding all contracts whatever.

Now, my idea of that statute is, that it did not dream of conferring any new virtues upon recorded deeds nor of curing their defects, but simply intended to disable unrecorded ones, and remove them from competition with recorded ones. It never could have been intended to say that registry should

be a cure-all; to make a deed good which was against all the principles of the law. It was intended to leave the recorded deeds unaffected by the unrecorded ones, but not unaffected by *law*; to leave them in just as good condition as if the older unrecorded deeds were not in existence, but certainly not in any *better* condition. The whole scope of this Registry Act was to protect people against *secret* deeds. I do not think it was intended to make any deed good, nor to make any bad, except for the single cause of failure to register. I therefore think that this common law principle was not repealed by the Registry Act of 1755, but was of force on the 14th May, 1776, and so was formally adopted by our adopting Act of 1784. Nor was it repealed by the Registry Act of 1785, nor any subsequent Registry Act, for these are all open to the very same remarks which I have m—··· on that of 1755. My conclusion is, that it now is, and always has been the law of Georgia, imported with the common law of England that a sale of land made in the face of an adverse possession, is void.

Judgment reversed.